# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **KAROLINA RAI** *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-863-TSC |
| | ) | |
| **JOSEPH R. BIDEN,** *in his official capacity as President of the United States of America*, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs are 2021 diversity visa program selectees and their derivative beneficiaries who reside in Europe, South Africa, Namibia, and China.  Plaintiffs allege that the State Department and its Kentucky Consular Center unlawfully implemented two Presidential Proclamations to suspend the processing, adjudication, and issuance of their 2021 diversity visa applications. Plaintiffs have moved for a preliminary injunction, ECF No. 8, asserting that if the State Department does not issue Plaintiffs visas before midnight on September 30, 2021, the State Department cannot issue those visas without a court order.

The government has moved to dismiss for lack of subject matter jurisdiction.  ECF No. 38.  For the reasons stated below, the court will GRANT in part and DENY in part Defendants' motion to dismiss and will GRANT in part and DENY in part Plaintiffs' motion for preliminary injunction.

1

# I.   BACKGROUND

## A.   The Diversity Visa Program

Congress created the diversity visa program under the Immigration and Nationality Act ("INA") to allow for more immigration to the United States from countries with traditionally low rates of immigration.  *See* 8 U.S.C. §§ 1153(c)(1)(B)(ii), 1153(c)(1)(E)(ii).  The program permits the State Department to issue up to 50,000 visas to individuals from specified countries.[1]  8 U.S.C. § 1151(e).  Millions of people enter the lottery every year.  *See* U.S. Dep't of State, *Diversity Visa Program, DV 2019-2021: Number of Entries During Each Online Registration Period by Region and Country of Chargeability*.[2]  Those selected for the program are not guaranteed to receive a visa—only the opportunity to apply for one.  A successful lottery applicant is eligible to receive a visa only during the fiscal year in which she applied and was selected.  8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f).  If the selectee does not receive a visa by the end of the fiscal year, then they are out of luck: "Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the" fiscal year in which the visa applicant was selected.  *Id.*

## B.   The Adjudication Process

The diversity visa program is administered at the State Department's Kentucky Consular Center ("KCC").  *See* 9 Foreign Affairs Manual ("FAM") 502.6-4(c)(1)(a).  After successful

---

[1] The statute makes available up to 55,000 diversity visas annually, but 5,000 of those are reserved for aliens covered by the Nicaraguan Adjustment and Central American Relief Act of 1997.  *See* Pub. L. No. 105–100, 111 Stat. 2193 (1997).

[2] *Available at* https://travel.state.gov/content/dam/visas/Diversity-Visa/DVStatistics/DV-applicant-entrants-by-country-2019-2021.pdf.

applicants are notified of their selection and visa number, they must then submit a DS-260,

Immigrant Visa and Alien Registration Application, and various supporting documents to the

KCC.  *See* 9 FAM 502.6-4(d)(1)(a), (b).  When the KCC confirms that an applicant has properly

completed and submitted the DS-260 and necessary paperwork, the applicant will be considered

"documentarily qualified."  9 FAM 502.6-4(c)(2)(c).  Then, as determined by the State

Department's monthly visa bulletin, the "KCC will schedule" the selectee for an immigrant visa

interview at a United States embassy or consulate "when his or her regional lottery rank number

is about to become current."  9 FAM 502.6-4(d)(2).  A consular officer's decision to "issue or

refuse an immigrant visa application must be based on a personal interview, during which the

consular officer must ensure that all required documentation has been provided, that there is a

legal basis for the applicant to immigrate, and there are no ineligibilities that would affect the

visa issuance."  9 FAM 504.1-3(f).  "A visa can be refused only upon a ground specifically set

out in the law or implementing regulations."  22 C.F.R. § 40.6.

### C.  <u>Presidential Proclamations and State Department Guidance</u>

Between January and May 2020, then President Trump issued five Presidential

Proclamations containing similar provisions that suspended the entry of certain immigrants and

non-immigrants from specific countries.  Proclamation No. 9984, 85 Fed. Reg. 6709 (Jan. 31,

2020) (China); Proclamation No. 9992, 85 Fed. Reg. 12855 (Feb. 29, 2020) (Iran); Proclamation

No. 9993, 85 Fed. Reg. 15045 (Mar. 11, 2020) (26 European countries in Schengen Area);

Proclamation No. 9996, 85 Fed. Reg. 15341 (Mar. 14, 2020) (United Kingdom and Ireland);

Proclamation No. 10041, 85 Fed. Reg. 31933 (May 24, 2020) (Brazil).  In his first days in office,

President Biden issued Proclamation 10143, which extended the suspension on entry of certain

immigrants and nonimmigrants from the Schengen Area, United Kingdom, Ireland, and Brazil, and added South Africa to the list.  Proclamation No. 10143, 86 Fed. Reg. 7467 (Jan. 25, 2021).

The five "Regional Proclamations" restrict the entry of persons who, within 14 days of seeking entry to the United States, were physically present within various COVID-19 global "hotspots."  But they also contain exceptions to that prohibition on entry, including an exception for those persons whose entry the Secretary of State deems to be "in the national interest."  *See*, *e.g.*, Proclamation No. 9984; Proclamation No. 10143.  Beginning on March 20, 2020, the State Department interpreted the Regional Proclamations to suspend not only "entry" of immigrants, but also the issuance of visas, unless an applicant (1) was eligible for an exception to the Regional Proclamations (such as the national interest exception), and (2) qualified for mission critical or emergency designations under the State Department's guidance.  *See* ECF No. 8-4, Mot. for PI, Ex. 3, 20 STATE 42180 ¶ 4.  *See also* ECF No. 8-6, Mot. for PI, Ex. 5, 20 STATE 61886 ¶ 1.  That suspension policy applied to diversity visas because the State Department did not consider those visas to be in the national interest or meeting a mission critical or emergency designation.  *See* ECF No. 8-5, Mot. for PI, Ex. 4, 20 STATE 54966, *Mission-Critical Visa Services to Include IR1s and IR2s*.

On May 1, 2020, Defendants released the Diplomacy Strong Framework ("Diplomacy Strong"), which was implemented on July 14, 2020.  The Diplomacy Strong guidance required a phased resumption of routine visa services, but the suspension of diversity visas remained in place.  *See* U.S. Dep't of State, *Suspension of Routine Visa Services*; 20 STATE 65080 ¶¶ 1-8.

In response, the KCC stopped processing diversity visa applications and stopped scheduling eligible applicants for interviews at embassies and consular posts, instead dedicating

its resources to processing visa applications that were not subject to the suspension policy.  *See* ECF No. 41, Hr'g Tr. at 21-23 (June 10, 2021).

On April 8, 2021, eight days after Plaintiffs filed their lawsuit, the Secretary of State updated the State Department's policy with regards to the Regional Proclamations.  ECF No. 30-1, Defs.' Opp'n, Ex. A.  The Secretary announced a national interest exception to the Proclamations and that "Immigrant Visa processing posts may now grant immigrant . . . visas to applicants otherwise eligible, notwithstanding" the Regional Proclamations.  *Id.*  As a result, the KCC began processing diversity visa applications and scheduling qualified applicants for interviews, and embassies and consular posts began adjudicating and issuing diversity visas.  *See* ECF No. 30-2, Defs.' Opp'n., Ex. B. at 4.

**D.  Plaintiffs' Lawsuit and the Government's Motion to Dismiss**

Plaintiffs are 60 selectees of the 2021 diversity visa program and their 107 derivative beneficiaries (their spouses and children under 21 years old).[3]  The sixty named Plaintiffs reside in countries subject to Proclamations 9984 and 10143.  ECF No. 22, First Amended Compl. ("FAC") ¶ 2.  They were selected in the 2021 diversity visa lottery and subsequently applied for 2021 diversity visas.  *Id.* ¶¶ 18-19.  All are "documentarily qualified" and have had current visa numbers since May 2021 or earlier.  *Id.* ¶¶ 19, 508-509.  As of August 13, 2021, twenty-two of them have had their applications adjudicated.  *See* ECF No. 49, Joint Status Report at 5-6 (Aug. 13, 2021).  The other thirty-eight, as of August 13, 2021, were still waiting.  *Id.*  The parties

---

[3] This case was originally brought by seventy-one Plaintiffs and their derivative beneficiaries, but on June 29, 2021, the court dismissed eleven Plaintiffs from the case without prejudice.  ECF No. 47, Order of Partial Dismissal.

agree that of those thirty-eight, twenty-five are unlikely to receive an interview before the end of the fiscal year.  *Id.* at 6.

Plaintiffs claim that Defendants implemented a regional "No-Visa Policy" suspending the processing, adjudication, and issuance of diversity visas for persons subject to Proclamations 9984 and 10143.  Plaintiffs argue that the regional No-Visa Policy violates the Administrative Procedures Act ("APA"), constitutional separation of powers principles, and the nondelegation doctrine, and that they are entitled to relief under the Mandamus Act.  In response, Defendants contend that the court should deny Plaintiffs' motion for preliminary injunction and should instead dismiss this case because Plaintiffs have not suffered a concrete injury, present only moot issues, and cannot question the executive branch's authority to restrict immigrants from entering the country.

## II.    LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the court's jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  The "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The plaintiff bears the burden of establishing the elements of standing, *id.* at 561, and each element "'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation,'"  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).  The plaintiff must "show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury."  *Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citation omitted).

6

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court can consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

A preliminary injunction is an "extraordinary" remedy that "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail on a motion for preliminary injunction, the movant bears the burden of showing that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts in this jurisdiction evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). The weighing of the four factors is within the district court's discretion. *See Davis*, 571 F.3d at 1291.

7

### III.   ANALYSIS

Plaintiffs allege that Defendants violated the APA seven different ways, violated the Mandamus Act, and violated separation of powers principles and the nondelegation doctrine. Because Defendants' justiciability arguments overlap with Plaintiffs' likelihood of success on the merits of their motion for preliminary injunction, the court will merge its analysis of the two motions where applicable.

### A.   **Likelihood of Success on APA Claims**

#### 1.   Justiciability

To establish likelihood of success on the merits, Plaintiffs must first establish that their claims are justiciable.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Defendants argue that Plaintiffs cannot establish justiciability because they do not have standing, their claims are moot, and the court lacks subject matter jurisdiction.

##### i.   *Standing*

To establish standing, a plaintiff bears the burden of showing "(1) [she] has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision."  *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (cleaned up).  On a motion to dismiss, the court must evaluate whether the plaintiffs have established standing pursuant to Federal Rule of Civil Procedure 12(b)(1).  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).  Where the plaintiffs have moved for a preliminary injunction, they must show "a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment."  *Elec. Priv. Info. Ctr.*, 878

F.3d at 377 (cleaned up).  As a result, the plaintiffs cannot rest on mere allegations and instead must "set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing."  *Id.* (cleaned up).  Only one plaintiff need meet this standard. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

In support of their motion, Plaintiffs submit declarations from thirty-two of the original seventy-one Plaintiffs.  Among them is a declaration from Plaintiff Katsiaryna Klimiankova, who is an accountant and resides in Belarus.  ECF No. 8-31, Mot. for PI, Ex. 30, Klimiankova Decl. ¶¶ 4, 7.  Despite the fact that Klimiankova timely submitted all documents and has had a current visa number since April 2021, the KCC has not scheduled her consular interview.  *See* FAC ¶¶ 321-22; Klimiankova Decl. ¶ 5; U.S. Dep't of State, *Visa Bulletin For March 2021*[4]; Joint Status Report at 2 (Aug. 13, 2021).  The parties agree that Klimiankova will likely not receive an interview before the end of the fiscal year and her application will expire on October 1.  Joint Status Report at 5-6 (Aug. 13, 2021).

***Injury***.  Defendants argue that Plaintiffs lack standing because neither Klimiankova nor any other Plaintiff has suffered a concrete or particularized injury.  Def. Opp'n at 18.  The court disagrees.  Klimiankova, like the other Plaintiffs, asserts a procedural injury—the withholding of statutorily mandated, non-discretionary review and adjudication of her visa applications.  This procedural deprivation is paired with a concrete interest—Klimiankova's interest in having her visa application adjudicated before September 30, 2021.  Together, the alleged procedural violation and concrete interest are sufficient to establish injury.  *See Smirnov v. Clinton*, 806 F.

---

[4] *Available at* https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2021/visa-bulletin-for-march-2021.html.

Supp. 2d 1, 10 (D.D.C. 2011) (finding standing "based upon the plaintiffs' lost opportunity to have their visa applications—some of which have already been submitted—fully processed and considered"), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012); *Gomez v. Trump* (*Gomez I*), 485 F. Supp. 3d 145, 171 (D.D.C. 2020).

Defendants argue that a recent opinion in this district, *Gjoci v. Department of State,* supports their position. *See* ECF No. 50, Notice of Supp. Authority (citing *Gjoci v. Dep't of State*, No. 1:21-CV-00294-RCL, 2021 WL 3912143, at *1 (D.D.C. Sept. 1, 2021)). The facts of *Gjoci*, however, differ from the facts of this case in material ways. In *Gjoci*, plaintiffs filed their operative complaint roughly four months after the alleged procedural violation had ended. *Gjoci*, 2021 WL 3912143, at *4-5. Courts ordinarily assess standing from the time that the operative complaint was filed, *see G&E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147, 159–60 (D.D.C. 2016), so the plaintiffs in *Gjoci* were unable to establish any concrete injury, 2021 WL 3912143, at *12. Instead, they alleged that the past procedural violation "increased the risk" that they would suffer a future injury. *Id.* To sustain such a claim, plaintiffs must satisfy a "strict" standard of showing both "(i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch, Inc.*, 808 F.3d at 914. Applying that standard, the court in *Gjoci* held that plaintiffs failed to show a substantial likelihood of standing. 2021 WL 3912143, at *14.

Unlike *Gjoci*, here, the alleged violation was ongoing when Plaintiffs filed their Complaint on March 31, 2021.[5] At that time, the alleged injury—the withholding of statutorily

_____

[5] Plaintiffs amended their Complaint on April 13, 2021, after the Secretary issued the April 8, 2021 exception, but did so at the court's direction to correct typographic errors that were not material to the case. ECF No. 29, Hr'g Tr. (April 13, 2021) (instructing Plaintiffs to "refile

mandated, non-discretionary review and adjudication of Plaintiffs' visa applications—was apparent, and so the court need not consider whether the past procedural violation "increased the risk" that they would suffer a future injury.

Moreover, even under the "strict" standard for an "increased risk of harm" injury, Plaintiffs have demonstrated that at least one of them has a sufficiently imminent injury in fact. As discussed above, Klimiankova had submitted all necessary documents and had a current visa number in April 2021, making her eligible for an interview with roughly six months remaining in the fiscal year. Yet the embassy in Warsaw, where Klimiankova's application would be adjudicated, did not issue any diversity visas while the regional No-Visa Policy was in place. *See* U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*.[6] Not until May 2021, after the Secretary of State excepted Plaintiffs from the regional No-Visa Policy, did the Warsaw embassy begin to adjudicate diversity visas. *Id.* By then it was too late. Although Defendants continue to work through the significant backlog created during the first six months of the year, they concede that Klimiankova will not receive an interview by the September 30 deadline. Joint Status Report at 2 (Aug. 13, 2021). Klimiankova has thus established both a substantially increased risk of losing out on her right to a visa adjudication and a substantial probability of such harm. *See Filazapovich v. Dep't of State*, No. 21-CV-00943

---

[errata] as an amended complaint even though it doesn't make any substantive changes"). Because Plaintiffs did not "voluntarily" amend their Complaint, the court still considers standing from the March 31 filing date. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.").

[6] *Available at* https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/immigrant-visa-statistics/monthly-immigrant-visa-issuances.html.

(APM), 2021 WL 4127726, at *13 (D.D.C. Sept. 9, 2021) ("With less than thirty days remaining before the end of the fiscal year, and no immediate prospect of an interview in sight, [the plaintiff] has established both a substantially increased risk of losing out on her right to a visa adjudication and a substantial probability of such harm.").  On September 30, the door will close for good on Klimiankova's opportunity to have her visa application adjudicated.  Her injury is not speculative and is indeed imminent.  Consequently, Plaintiffs have shown a concrete and particularized injury.

*__Causation__*.  Because Plaintiffs assert a procedural violation, they can establish standing "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7.  A plaintiff asserting a procedural violation must show "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996).  To show a causal connection, Plaintiffs must show that it is substantially probable, but not certain, that the procedural violation "created a demonstratable risk, or caused a demonstratable increase in an existing risk" of injury to at least one plaintiff.  *Id.*  They "need not demonstrate that but for the procedural violation the agency action would have been different." *Mendoza*, 754 F.3d at 1010.

Plaintiffs have successfully shown a causal connection between the alleged procedural violation and their particularized injuries.  From October 2020 through March 2021, while the regional No-Visa Policy was in effect, Defendants issued just *six* diversity visas from the embassies and posts subject to Proclamations 9984 and 10143.  *See* U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*.  From April through July 2021, after the Secretary announced the April 8, 2021 exception, those same embassies and posts issued 645

diversity visas collectively, averaging roughly 161 diversity visas per month. *See id.* Thus, during the first six months of the year, those embassies and posts could have issued approximately 966 diversity visas (161 x 6) but for the regional No-Visa Policy. It "requires no imaginative leap" to say that this shortfall "created a demonstratable risk, or caused a demonstratable increase in an existing risk" that Defendants would run out of time to adjudicate Plaintiffs' applications by the September 30 deadline. *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 12-13 (D.D.C. 2002).

Defendants blame COVID-19 restrictions at U.S. embassies and consular posts for the delay, claiming that those restrictions are the true cause of Plaintiffs' injuries. The COVID-19 pandemic no doubt has greatly impacted Defendants' operations and the efficiency with which the KCC, embassies, and posts are able to process, adjudicate, and issue visas. But Defendants' argument is ultimately unpersuasive. From October 2020 through March 2021, while the processing of diversity visas was suspended, U.S. embassies and consular posts were able to process and adjudicate thousands of *non*-diversity visas despite the restrictions caused by COVID-19. U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*. Even factoring in the impacts of the pandemic, Defendants could have issued far more diversity visas had they not imposed the suspension policy. And in any event, Plaintiffs need not demonstrate that the absence of the 6-month suspension would "necessarily have made a difference. All that is necessary is that they show 'that the procedural step was connected to the substantive result.'" *Iyengar*, 233 F. Supp. 2d at 13 (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman,* 289 F.3d 89, 94–95 (D.C. Cir. 2002)). Plaintiffs have done so, and they clear the causation bar.

***Redressability***.  To establish redressability, a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).  Causation and redressability are "closely related" concepts, which typically "overlap as two sides of a . . . coin."  *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).

As in similar cases in this district, Plaintiffs have stated a plausible claim for relief.  *See*, *e.g.*, *Gomez v. Trump* (*Gomez II*), 490 F. Supp. 3d 276, 284 (D.D.C. 2020) (citing *Almaqrami v. Pompeo*, 933 F.3d 774, 780 (D.C. Cir. 2019)) (explaining that when the "plaintiff files suit and the court grants *some* relief—but not the visa—before October 1 . . . the court might lawfully take steps [after the fiscal year has ended] to compel the government to process the plaintiff's application and issue her a diversity visa anyway"); *Filazapovich*, 2021 WL 4127726, at *13. An order reserving visa numbers for adjudication after the fiscal year deadline "could result in Plaintiffs receiving a visa and immigrating to the United States," and that "is sufficient to preserve the court's subject matter jurisdiction over Plaintiffs' claims."  *Gomez v. Biden* (Gomez *III*), No. 20-CV-01419 (APM), 2021 WL 3663535, at *9 (D.D.C. Aug. 17, 2021) (citing *Almaqrami*, 933 F.3d at 783).  The court therefore has power to redress Plaintiffs' injuries.

### ii.  Mootness

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70 (1983).  "Even where litigation poses a live controversy when filed," a federal court must "refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the

14

future." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011).  Generally, voluntary

cessation of challenged activity does not moot a case, unless "the party urging mootness

demonstrates that (1) 'there is no reasonable expectation that the alleged violation will recur' and

(2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged

violation.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir.

1997) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)).

Defendants argue that this case is moot, but they have not shown that their voluntary

cessation of the procedural violation— the Secretary's April 8, 2021 national interest

exception—"completely and irrevocably eradicated the effects of the alleged violation." *Los*

*Angeles Cnty.*, 440 U.S. at 631.  Defendants' own statistics instead support the opposite

conclusion.  Defendants admit that as many as twenty-five Plaintiffs will not have the

opportunity to make a visa application before September 30, 2021.  *See* Joint Status Report (Aug.

13, 2021), Updated Miles Decl. ¶ 7.  In other words, while the national interest exception

restarted the visa processing, it did nothing to alleviate the six-month backlog that built up while

the suspension policy was in effect, and which continues to harm Plaintiffs.

But the court agrees with Defendants that the twenty-two Plaintiffs who have already had

their 2021 diversity visa applications adjudicated do not present a live case or controversy.

Indeed, Plaintiffs concede this point.  *See* Hr'g Tr. at 8-14 (June 10, 2021).  Accordingly, the

twenty-two remaining Plaintiffs whose applications have already been adjudicated will be

dismissed from the case.

### iii.   Subject Matter Jurisdiction

Next, Defendants reframe Plaintiffs' lawsuit as one challenging the Executive Branch's

power "to govern entry of foreign nationals."  ECF No. 38-1, Mot. to Dismiss at 24.  According

to Defendants, Plaintiffs "seek to diminish the President's ability to exercise his broad authority under 8 U. S. C. § 1182(f) to exclude non-citizens." *Id.* at 25.

To be sure, § 1182(f) grants the President "'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018). Indeed, the statute "exudes deference to the President in every clause." *Id.* But Plaintiffs do not challenge the President's authority to exclude non-citizens from *entering* the country. Instead, Plaintiffs present a different question: can Defendants halt the processing and issuance of diversity visas for applicants living in particular regions? A visa is a travel document allowing a person to access a port of entry and request permission to enter the United States, "but it does not guarantee the right to enter the country." *Gomez I*, 485 F. Supp. 3d at 158 (citing *Almaqrami*, 933 F.3d at 776). While Proclamations 9984 and 10143 address the entry of immigrants into the country, they say nothing about the issuance and adjudication of visas. Defendants ignore "the basic distinction between admissibility determinations," *i.e.*, entry determinations, and "visa issuance that runs throughout the INA." *Trump*, 138 S. Ct. at 2414 n.3 (collecting statutory examples).

Courts in this district have consistently allowed lawsuits to proceed to the merits when, as here, the lawsuit challenges a suspension of visa issuance. *See*, *e.g.*, *Gomez I*, 485 F. Supp. 3d at 176; *Filazapovich*, 2021 WL 4127726, at *13. So too, courts have jurisdiction over lawsuits concerning consular officials' failure to adjudicate and issue visas. *See*, *e.g.*, *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 114 (D.D.C. 2020); *Gomez I*, 485 F. Supp. 3d at 176; *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("When the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny

16

applications but failing to act at all.").  As in those cases, the court here has subject matter jurisdiction to consider the merits of Plaintiffs' lawsuit.

    2.  <u>Likelihood of Success on Merits of APA Claims</u>

Having determined that Plaintiffs present justiciable and reviewable claims under the APA, the court turns to Plaintiffs' likelihood of success on the merit of those claims.

>     i.  *Regional No-Visa Policy is Not in Accordance with Law and in Excess of Statutory Authority*

Plaintiffs assert that Defendants' regional No-Visa Policy is "'not in accordance with law' and 'in excess of statutory authority.'"  *See* Pl. Mot. at 19–21.  They contend that (1) neither the Proclamations nor statute nor State Department implementing regulations give Defendants such power, and so (2) Defendants' regional No-Visa Policy unlawfully usurps consular officers' sole and express statutory authority to issue visas to qualifying applicants.  *See id.*

Defendants respond that nothing prohibits them from suspending the processing and issuance of diversity visas.  *See* Defs.' Opp'n at 21–22.  They contend that the only statutory mandate is § 1153(e)(2), which provides that "immigrant visa numbers . . . shall be issued" in a "random order established by the Secretary of State."  8 U.S.C. § 1153(e)(2).  Neither of these arguments are persuasive.

First, Defendants' argument is contradicted by §§ 1202(b) and 1202(d) of the INA, which requires that all immigrant and nonimmigrant visa applications "*shall* be reviewed and adjudicated by a consular officer."  8 U.S.C. § 1202(b), (d) (emphasis added).  *See also Gomez I*, 485 F. Supp. 3d at 198 n.23 (rejecting the State Department's argument that they have no "nondiscretionary duty to afford Plaintiffs the opportunity to apply for immigrant visas at consular interviews").  Second, § 1153(e)(2), the provision upon which Defendants rely, is

inapplicable to the controversy at issue.  That provision applies to the issuance of visa numbers

through the annual diversity visa lottery, which selects 100,000 winners who are eligible to apply

for one of the 50,000 visas.  *Smirnov v. Clinton*, 487 F. App'x 582, 583 (D.C. Cir. 2012).

Contrary to Defendants' suggestion, § 1153(e)(2) does not mandate that the processing,

adjudication, and issuance of diversity applications be so random that a Secretary could lawfully

suspend the program for indefinite periods of time without statutory justification.

      To be clear, there is no statutory requirement that every available diversity visa be issued

each year.  But that does not mean that the State Department can decide to suspend the diversity

program for six months of the fiscal year, thereby drastically reducing the number of diversity

visa applications that could be processed, adjudicated, and issued.  Doing so would plainly

frustrate Congress's intent to make available 50,000 diversity immigrant visas each year.  *See*

*Gomez I*, 485 F. Supp. 3d at 196; *In re People's Mojahedin Org. of Iran*, 680 F.3d at 837; 8

U.S.C. §§ 1151(e), 1153(c)(1)(A) (providing that persons "subject to the worldwide level

specified in section 1151(e) of this title for diversity immigrants shall be allotted visas each fiscal

year" pursuant to a detailed statutory scheme); H.R. Rep. No. 101-723, pt. 1 (1990) (finding that

it is important "to promote diversity in [the] immigration system").

      Accordingly, the court concludes that Plaintiffs are likely to succeed on the merits of

their claim that Defendants' regional No-Visa Policy is "not in accordance with law" and "in

excess of statutory . . . authority."  5 U.S.C. § 706(2).  *See Gomez I*, 485 F. Supp. at 199.

              *ii.   Regional No-Visa Policy is Arbitrary and Capricious*

      Next, Plaintiffs allege that Defendants' regional No-Visa Policy is arbitrary and

capricious because it lacks any reasoned explanation and the State Department failed to consider

the consequences the policy would impose on diversity visa selectees.  *See* FAC at 70-71, 73-74;

Pl. Mot. at 20-21.  Defendants did not respond to this allegation, and the court will therefore treat it as conceded.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (explaining that if a party files an opposition addressing only some of the movant's arguments, the court may treat the unaddressed arguments as conceded).  A district court in this jurisdiction has already rejected Defendants' "illogical foisting" of the Regional Proclamations onto diversity visa processing, adjudication, and issuance.  *See Gomez v. Trump*, 486 F. Supp. 3d 445, 450 (D.D.C. 2020), *modifying*, *Gomez I*, 485 F. Supp. 3d at 145.  As in that case, here, Defendants' policy stands on a faulty legal premise and lacks adequate rationale.  Thus, Plaintiffs are likely to succeed on their argument that the policy is arbitrary and capricious.

### iii.   Notice-and-Comment Rulemaking Claim is Moot

Plaintiffs ask the court to enjoin Defendants' regional No-Visa Policy, arguing that Defendants' implementation of the Proclamations was unlawfully promulgated without notice-and-comment rulemaking.  *See* Compl. ¶ 596; Mot. for PI at 21-23.  According to Plaintiffs, Defendants did not give notice regarding the policy and failed to give interested parties an "opportunity to participate in the rule making" process.  *Id.* at 21 (citing 5 U.S.C. § 553(c)).

It is undisputed that Plaintiffs are now exempt from that policy and their visa applications are being processed, adjudicated, and issued.  *See* Joint Status Report (Aug. 13, 2021).  Consequently, the court cannot enjoin the policy, and Plaintiffs' notice-and-comment challenge is moot.  *See Almaqrami*, 933 F.3d at 783; *Filazapovich*, 2021 WL 4127726, at *24.

### iv.   Defendants Unreasonably Delayed Processing and Adjudication of Plaintiffs' Visa Applications

In assessing whether Defendants unreasonably delayed processing and adjudicating Plaintiffs' diversity visa applications, the court analyzes the six factors identified in

*Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70, 79–80 (D.C. Cir. 1984):

> (1) The time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re People's Mojahedin Org. of Iran*, 680 F.3d at 836-37 (internal quotation marks omitted). "[T]he central question is whether the agency's delay is so egregious as to warrant mandamus." *Id.* at 837 (internal quotation marks omitted).

Defendants contend that, applying the *TRAC* factors, the court should find that Plaintiffs have failed to state a valid claim. For reasons explained below, the court disagrees and finds that Plaintiffs are likely to prevail on their unreasonable delay claim.

***Factors one and two***. The INA provides a "clear 'indication of the speed with which it expects the agency to proceed in' processing diversity lottery selectees' visa applications." *Gomez I*, 485 F. Supp. 3d at 196 (quoting *TRAC*, 750 F.2d at 80). That statute "sets an absolute, unyielding deadline by which selectees must receive their visas." *Id.* The September 30 deadline is specific and concrete, which "manifests Congress's intent that the State Department undertake good-faith efforts" to adhere to it. *Filazapovich*, 2021 WL 4127726, at *18. It also "supplies content for the *TRAC* rule of reason." *Gomez I*, 485 F. Supp. 3d at 196. Under that rule of reason, the State Department cannot "effectively extinguish the diversity program" for six months and let pending diversity visa applications expire without plainly frustrating

congressional intent to make available 50,000 diversity immigrant visas each year.  *Id.* (citing *Mojahedin*, 680 F.3d at 837); *accord In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986) (agency's failure to meet statutory deadline was unreasonable because it eviscerated "the very purpose of the regulation").

The court recognizes that, in determining how quickly to process diversity visa applications, Defendants must balance other considerations, such as local health and safety conditions at foreign embassies and consular posts.  But Congress's instructions are the "most important" consideration in the *TRAC* analysis.  *Filazapovich*, 2021 WL 4127726, at *18.  When Congress set the September 30 deadline, it "undoubtedly knew the enormous demands placed upon the Secretary."  *People's Mojahedin*, 680 F.3d at 837.  Knowing that the Secretary would have "other, competing draws on its resources," Congress nevertheless established the fiscal year deadline in concrete terms, and the fact that the State Department has competing priorities does not permit Defendants to freeze the diversity visa program for six months of the fiscal year based on an erroneous interpretation of the law.  *Filazapovich*, 2021 WL 4127726, at *18.  So, factors one and two favor Plaintiffs.

**_Factors three and five_**.  The third and fifth *TRAC* factors concern human health, welfare, and the nature and extent of the interests prejudiced by delay.  Plaintiffs argue that they have lost gainful employment, educational opportunities, and fear that they will lose their chance to immigrate to the United States.  *See* Mot. for PI at 32.  Plaintiffs maintain that they have "sold property, foregone employment opportunities, or borrowed large amounts of money to afford their immigration to the United States."  *Id.* (citing Compl., Ex. 9-32).  Defendants "acknowledge that aspects of these factors may tip in favor of Plaintiffs."  Defs.' Opp'n at 24.

21

Plaintiffs have established "dire" prejudice.  They "'risk losing their (likely) once-in-a-lifetime opportunity to immigrate to the United States' and have demonstrated how delays in visa adjudication threaten their welfare."  *See Filazapovich*, 2021 WL 4127726, at *19 (quoting *Gomez III*, 2021 WL 3663535, at *19).  Defendants ask the court to also weigh "the public health risks" facing consular officials and to respect the State Department's "duty to protect its employees."  Defs.' Opp'n at 25.  But "Defendants' decision not to process diversity visas for the first [six] months of the fiscal year was not taken in consideration of employees' health—it was taken based on an erroneous interpretation of the law."  *Filazapovich*, 2021 WL 4127726, at *19.  For instance, despite credible health risks imposed by COVID-19, consular officials subject to Proclamations 9984 and 10143 continued to process and adjudicate *non*-diversity visas during the six-month suspension.  *See* Pl. Reply at 16; U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*.  Defendants offer no explanation as to why COVID-19 health risks were unique to processing and adjudicating diversity visas.  Accordingly, factors three and five also favor Plaintiffs.

**_Factor four_**.  Next, the court considers the effect of expediting delayed action on agency activities of a higher or competing priority.  Defendants argue that in a world of limited resources, processing and adjudicating visas is a zero-sum game, such that any order prioritizing Plaintiffs' applications necessarily moves other applicants "back in line."  Defs.' Opp'n at 25.  The court recognizes that the "Department has had to make difficult decisions about how to manage" a "backlog of 600,000 prospective immigrant visa applications."  Defs.' Opp'n at 25.  However, "the State Department's lack of resources to adequately confront that obstacle is not dispositive here."  *Filazapovich*, 2021 WL 4127726, at *20.

The court's conclusion that Defendants' six-month cessation is significantly likely to constitute unreasonable delay "is not a simple reorganization of the Department's priorities, but a rectification of Defendants' decision to flout the INA by sitting on its hands." *Filazapovich*, 2021 WL 4127726, at *20 (citing *Gomez III*, 2021 WL 3663535, at *19; *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)).  Moreover, the court's ruling does not require the State Department to drop everything and process Plaintiffs' diversity visa applications.  Rather, it directs the State Department to reserve a finite number of visa numbers for processing and adjudication after September 30, thus mitigating any negative impact on agency activities.  Consequently, the court finds that the fourth factor also favors Plaintiffs.

***Factor six***.  Neither party carries the day on the sixth factor, which concerns agency impropriety.  Plaintiffs summarily argue that Defendants' apparent disregard for the impending statutory deadline shows impropriety.  *See* Compl. ¶ 628.  Defendants deny, without elaboration, that they have not "engaged in impropriety."  *See* Defs.' Opp'n at 26.

The court finds that this factor is neutral, and, in any event, it "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."  *Gomez III*, 2021 WL 3663535, at *20 (quoting *TRAC*, 750 F.2d at 80).

Ultimately, after weighing the *TRAC* factors, the court finds that it is likely that Defendants unreasonably delayed processing Plaintiffs' diversity visa applications when they declined to process any diversity visas for the first six months of the Fiscal Year.  Plaintiffs are therefore likely to succeed on their unreasonable delay claim.

> v. *Defendants Unlawfully Withheld Processing and Adjudicating of Plaintiffs' Visa Applications*

Having found it likely that Defendants unreasonably *delayed* processing Plaintiffs' diversity visa applications, the court now considers whether Plaintiffs are likely to succeed on their claim that Defendants unlawfully *withheld* Plaintiffs applications.  To establish an unlawful withholding claim, Plaintiffs must show that the "agency failed to take a discrete agency action that it is required to take."  *Norton*, 542 U.S. at 64.  Defendants argue that Plaintiffs are unlikely to succeed on this claim because Defendants do not have a nondiscretionary duty to process diversity visas.

As previously explained, 8 U.S.C. § 1202(b) imposes a nondiscretionary duty on Defendants to adjudicate diversity visas.  *See Filazapovich*, 2021 WL 4127726, at *20.  And, for the reasons discussed above, Defendants failed to adjudicate diversity visas in contravention of that nondiscretionary duty.  Accordingly, the court concludes that Plaintiffs are likely to succeed on the merits of their unlawful withholding claim.

> vi. *Exclusion of 2021 Diversity Visa Applications from Mission Critical and Emergency Designations*

Plaintiffs challenge the State Department's "mission critical" and "emergency" guidance, arguing that diversity visa applicants were excluded from the "class of 'mission critical' services" in a manner that was arbitrary, capricious, and unlawful under the APA.  *See* Mot. for PI at 23.

On March 20, 2020, when the State Department suspended routine visa services at all U.S. embassies and consulates but permitted posts to continue providing "emergency and mission critical visa services" as resources allowed, the processing or adjudication of diversity visa applications did not fall within the "emergency" or "mission critical services" exception.

24

*See Gomez I*, 485 F. Supp. 3d at 198; Mot. for PI, Ex. 4, *State Department Memo regarding Mission-Critical Visa Services to Include IR1s and IR2s* at 1.  On May 1, 2020, Defendants released the Diplomacy Strong Framework, which required a phased resumption of routine visa services, but the suspension of diversity visas continued.  *See* U.S. Dep't of State, *Suspension of Routine Visa Services*; 20 STATE 65080 ¶¶ 1-8.

The mission critical policy and Diplomacy Strong guidance, however, were replaced with new guidance in November 2020.  *See* 20 STATE 110220, *Expanded Guidance on Prioritization for the Phased Resumption of Routine Visa Services* (Nov. 12, 2020) ("[P]osts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance.").  Not only had the mission-critical and Diplomacy Strong policies ended months before Plaintiffs sued, but Plaintiffs also fail to show how those policies had any real impact on the 2021 diversity visa program when the policies were only in effect during the first month of the 2021 fiscal year.  Thus, the court will grant Defendants' motion as to the State Department's mission critical guidance policy.  *See Filazapovich*, 2021 WL 4127726, at *21 (citing *True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) ("As applied in the context of injunctive litigation, if there remains no conduct to be enjoined, then normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of the court has expired under Article III.")).

### vii.   *Implementation of National Interest Exception*

Plaintiffs' final APA claim did not appear in their Complaint.  For the first time, in their motion for preliminary injunction, Plaintiffs challenge Defendants' implementation of the national interest exception for persons subject to the Regional Proclamations, claiming that

implementation was final agency action, not committed to agency discretion, and was arbitrary, capricious, and contrary to law.  *See* Mot. for PI at 27-30.

A plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint.  *Gjoci*, 2021 WL 2530651, at *5 (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).  A "proper motion for a preliminary injunction seeks to enjoin the action that *the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for the Court to grant preliminary relief."  *Bird v. Barr*, No. 19-CV-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (emphasis added) (citing *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)).

Because Plaintiffs' raise this challenge only in their motion, the court finds that Plaintiffs have failed to state a valid claim against Defendants' implementation of the national interest exception.  An order enjoining the national interest exception would not alleviate the harm Plaintiffs allege in their Complaint: that Defendants have refused to carry out their nondiscretionary duty of processing and adjudicating diversity visas.  Rather, were the court to enjoin the national interest exception, Defendants' regional No-Visa Policy would remain unscathed.  Accordingly, the court will dismiss Plaintiffs' challenge to the national interest exception.  *See Gjoci*, 2021 WL 2530651, at *2 (dismissing motion for preliminary injunction where "the mismatch between the request for injunctive relief and the complaint complicated the Court's ability to 'meaningfully assess' plaintiffs' entitlement to injunctive relief") (cleaned up).

**B.  Likelihood of Success on Mandamus Act Claim**

Mandamus relief is proper only if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).

Mandamus relief here is unwarranted.  "[T]he standards for obtaining relief" under § 706(1) of the APA and the Mandamus Act are "essentially the same," *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010), and relief under the Mandamus Act is only warranted when "there is no other adequate remedy available to the plaintiff," *Fornaro*, 416 F.3d at 69.  The court has already found that Plaintiffs are likely to succeed on their § 706(1) claims, and with that remedy in hand, Plaintiffs are unlikely to succeed on the merits of their Mandamus Act claim.  *See Filazapovich*, 2021 WL 4127726, at *24; *Gomez I*, 485 F. Supp. 3d at 198. Therefore, the court will deny Plaintiffs' request for preliminary relief under the Mandamus Act.

**C.  Likelihood of Success on Separation of Powers and Nondelegation Doctrine Claims**

Plaintiffs also assert that Proclamations 9984 and 10143 usurp the authority delegated to the President under the INA, and therefore violate constitutional separation of powers principles and the nondelegation doctrine.  FAC ¶¶ 642–650.

In support of this claim, Plaintiffs point to *Doe v. Trump*, 418 F. Supp. 3d 573, 589-93 (D. Or. 2019), in which the plaintiffs advanced the same separation of powers and nondelegation doctrine arguments that Plaintiffs now urge the court to heed.  *Id.*  Plaintiffs, however, ignore the fact that the Ninth Circuit reversed their case in chief.  *See Doe #1 v. Trump*, 984 F.3d 848 (9th Cir. 2020), *vacated sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (vacating as moot). In doing so, the Ninth Circuit relied on the Supreme Court's decision in *Trump v. Hawaii* and

upheld the President's broad ability to exercise discretion under 8 U. S. C. §1182(f). *Id.* at 864 (citing *Trump*, 138 S. Ct. at 2408). The District Court in *Gomez* came to the same conclusion regarding the separation of powers and nondelegation challenges brought against two similar Presidential Proclamations. *See Gomez I*, 485 F. Supp. 3d at 186. Plaintiffs do not address these cases, nor do they point to any other authority that supports their position. The court will therefore dismiss Plaintiffs' separation of powers and nondelegation doctrine claims for failure to state a valid claim for relief.[7]

### D.  Remaining Factors Governing Preliminary Relief

Having found that Plaintiffs are likely to succeed on certain of their APA claims, the court now turns to the remaining factors governing preliminary injunctive relief.

#### 1.  Irreparable Harm

A party seeking preliminary injunctive relief must show that they imminently will be irreparably harmed by the challenged action or inaction. The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).

Plaintiffs have made a clear showing of irreparable harm. As other courts in this district have found, the loss of the "'opportunity to immigrate to the United States through the diversity

---

[7] Defendants also move dismiss President Biden as a named Defendant, arguing that Plaintiffs have failed to state a valid claim for relief against the President because courts do not have jurisdiction to enjoin a President in the performance of his official duties. Mot. to Dismiss at 20. Plaintiffs do not offer any argument in response, *see generally* ECF No. 44, Pls.' Opp'n to Mot. to Dismiss, and the court will treat the issue as conceded, *Wannall*, 775 F.3d at 428.

visa program' constitutes an irreparable injury." *Filazapovich*, 2021 WL 4127726, at *24

(quoting *Gomez I*, 485 F. Supp. 3d at 200). *See also P.K. v. Tillerson*, 302 F. Supp. 3d 1, 10

(D.D.C. 2017) (granting injunctive relief considering "the potential irreparable harm" of not

having their visas adjudicated). Plaintiffs are in imminent risk of permanently losing their

opportunity to have their diversity visa applications adjudicated, "and that permanent loss is

irreparable." *Filazapovich*, 2021 WL 4127726, at *24.

    2.  <u>Balance of Equities and Public Interest</u>

Finally, Plaintiffs must demonstrate that the balance of equities tips in their favor and that

an injunction is in the public interest. *Winter*, 555 U.S. at 20. The balance of equities and the

public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

The court recognizes the difficulty of having to manage a substantial backlog of visa

applications, but the public and Plaintiffs have a countervailing interest "in having governmental

agencies abide by the federal laws that govern their existence and operations." *League of*

*Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks

omitted). While "the public certainly has an interest in Defendants processing other types of

visas in addition to diversity visas, it also has an interest in diversity visa applicants," like

Plaintiffs, "having their applications considered." *Filazapovich*, 2021 WL 4127726, at *25.

Moreover, "although the COVID-19 pandemic has disrupted visa processing writ large, diversity

visa applicants are in a unique position among visa applicants because their eligibility for a visa

ends on the last day of the fiscal year." *Id.* Given these demands, the court finds that the balance

of the equities and the public interest favor injunctive relief in this case.

E. **Remedy**

Given the Defendants' refusal to process or adjudicate diversity visa applications, Plaintiffs ask the court to order Defendants to expeditiously process and adjudicate Plaintiffs' visas and reserve Plaintiffs' visa numbers through the pendency of the litigation. In response, Defendants caution that any order moving Plaintiffs to the front of the visa adjudication line would be unfair to other applicants.

An injunction "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). Nevertheless, an "injunction must be narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (internal quotation marks omitted). As Justice Blackmun observed "in dissent but apparently expressing the view of all nine justices," *Nat'l Mining Ass'n*, 145 F.3d at 1409, when a single Plaintiff establishes that she was injured by the policy, Plaintiffs may obtain "relief that affects the rights of parties not before the court." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting).

Moreover, the "section of the APA governing preliminary relief, 5 U.S.C. § 705, authorizes "relief from agency action for any person otherwise subject to the action, not just as to plaintiffs.'" *Gomez I*, 485 F. Supp. 3d at 203 (quoting *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020). As the court in *Gomez* explained, "that provision allows 'the reviewing court' to 'issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings' to 'the extent necessary to prevent irreparable injury.'" *Id.* (quoting 5 U.S.C. § 705). That section "therefore 'authorizes courts to stay agency [action] pending judicial review,' not just to enjoin

their application to the injured parties before the court." *Id.* (quoting *Mexichem*, 787 F.3d at 562)

(Kavanaugh, J., dissenting in part). *See also In re GTE Service Corp.*, 762 F.2d 1024, 1026

(D.C. Cir. 1985) (recognizing that § 705 supplies "statutory authority to stay agency orders

pending review in this court"). By the same token, § 705's grant of power to "issue all necessary

and appropriate process" includes "the power to compel agency inaction when necessary 'to

preserve status or rights pending conclusion' of the action." *Gomez I*, 485 F. Supp. 3d at 203

(quoting 5 U.S.C. § 705).

In recent analogous cases, courts have ordered defendants to expeditiously process and

adjudicate diversity visas until the end of the fiscal year and reserve visa numbers for processing

and adjudication beyond the statutory deadline, both for the plaintiffs as well as non-plaintiff

visa applicants who suffered the same injury. *See Gomez I,* 485 F. Supp. 3d at 204; *Gomez II,*

490 F. Supp. 3d at 295; *Filazapovich*, 2021 WL 4127726, at *26. This approach produces an

equitable result. For example, were the court to limit relief only to Plaintiffs, and not include

other diversity visa applicants whose applications were suspended by Defendants' regional No-

Visa policy, then "thousands of individual lawsuits would likely follow, and the potentially

disparate outcomes of those cases would result in widespread administrative confusion. That

cannot be the outcome that Defendants desire." *Gomez I*, 485 F. Supp. 3d at 204. *See also*

*Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) (discussing "our country's strong interest in

the uniform application of immigration law and policy").

Therefore, the court will order Defendants to expeditiously process and adjudicate

diversity visas prior to September 30, 2021, and to reserve diversity visas after September 30,

2021, for processing and adjudication at those embassies and posts impacted by the regional No-

Visa Policy.

As a court of equity, the court cannot place Plaintiffs in a better position than they would have been in but for the State Department's legal mistakes; it can endeavor only to place Plaintiffs in the position they would have been in but for the errors. "Coming up with a reasonable estimate is hardly an exact science." *Gomez II*, 490 F. Supp. 3d at 289. A reasonable estimate is the number of 2021 diversity visas the State Department likely would have issued but for the regional No-Visa Policy.

Proclamations 9984 and 10143 pertain to thirty-one countries (twenty-six countries in the Schengen Area, as well as Brazil, China, Ireland, South Africa, and the United Kingdom). *See* Proclamation No. 9984, 85 Fed. Reg. 6709 (Jan. 31, 2020); Proclamation No. 10143, 86 Fed. Reg. 7467 (Jan. 28, 2021). However, only twenty-seven of those thirty-one countries have an embassy or consular post that processes diversity visas.[8] *See* U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*.

During the first half of the fiscal year, while the regional No-Visa policy was in effect, those twenty-seven embassies and posts collectively issued just six diversity visas. *See* U.S. Dep't of State, *Monthly Immigrant Visa Issuance Statistics, Fiscal Year 2021*. From April through July 2021, after the Secretary announced the April 8, 2021 exception, those twenty-seven embassies and posts collectively issued 645 diversity visas, averaging roughly 161 per month. *See id.* Thus, during the first six months of the fiscal year, those twenty-seven embassies

---

[8] The twenty-seven embassies and posts subject to the regional No-Visa Policy were those in Vienna, Brussels, Prague, Tallinn, Helsinki, Paris, Frankfurt, Athens, Budapest, Reykjavik, Naples, Riga, Bern, Vilnius, Amsterdam, Warsaw, Lisbon, Bratislava, Ljubljana, Madrid, Stockholm, Johannesburg, Hong Kong, Dublin, Guangzhou, London, and Rio De Janeiro.

and posts could have issued approximately 966 diversity visas (161 x 6) but for the regional No-Visa Policy.

Therefore, the court will order Defendants to undertake good faith efforts to expeditiously process and adjudicate 2021 diversity visa applications and derivative beneficiary applications by September 30, 2021, and to reserve 966 diversity visa numbers of applicants awaiting adjudication at the twenty-seven embassies and posts previously subject to Proclamations 9984 and 10143 and Defendants' regional No-Visa Policy.

## IV.    CONCLUSION

For the reasons stated above, the court will GRANT in part and DENY in part Defendants' motion to dismiss and will GRANT in part and DENY in part Plaintiffs' motion for preliminary injunction.

The court will GRANT Defendants' motion to dismiss Plaintiffs' claims regarding notice-and-comment rulemaking, the "mission critical" and "emergency" guidance, the national interest exception, and separation of powers and nondelegation doctrine.  The court will also GRANT Defendants' motion to dismiss President Biden as a named Defendant and the twenty-two Plaintiffs whose diversity visa applications have already been adjudicated.  The court will DENY the remainder of Defendants' motion to dismiss.

The court will GRANT Plaintiffs' motion for preliminary injunction on their claims that the regional No-Visa Policy violates the APA because it is contrary to law, in excess of statutory authority, arbitrary, and capricious, and that Defendants unreasonably delayed and unlawfully withheld processing and adjudication of Plaintiffs' applications.  The court will DENY Plaintiffs' motion for preliminary injunction as to the remainder of Plaintiffs' claims.

Date:  September 27, 2021

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge